Tom WILLIAMSON, Appellant,

v.

P. V. HICKMAN, Appellee.

No. 11295.

Court of Civil Appeals of Texas.

Austin.

May 12, 1965.

J. J. Byrne, Lampasas, for appellant.

Richard L. Johnson, Lampasas, for appellee.

HUGHES, Justice.

This is a will contest in which Tom Williamson,[1] appellant, contested the will of his mother, Mrs. Edith Williamson, who died March 4, 1964, at the age of 83 years.

Appellee, P. V. Hickman, brother of decedent and named Independent Executor in the instrument offered by him for probate as the last will and testament of decedent was one of its principal beneficiaries. Appellant contested the probate of such instrument in the Probate Court on the grounds of undue influence exercised by appellee and lack of testamentary capacity of decedent. This contest was sustained and the instrument was denied probate. On appeal to the District Court, after trial to a jury and upon its verdict, the instrument was probated as the will of Mrs. Edith Williamson.

Appellant has four points or assignments of error in his brief three of which are based on the failure of the trial court to grant him a new trial because two of the jurors who sat in the case were employees of the First National Bank of Lampasas, the president of such bank being a material witness for appellee, and that the decedent was a customer of such bank and had transacted bank business with Mr. Mickey Bozarth, the bank's employee and one of the jurors, and that had appellant known these facts he would not have accepted these two bank employees on the jury.

A hearing was held on the motion for a new trial and we will quote or state the substance of all testimony pertinent to the points under discussion.

Mr. Eddie Patrick, one of the jurors who was employed by the First National Bank, testified that when he was questioned on voir dire examination as a prospective juror he did not then know that the president of the bank, Mr. C. A. Northington, was to be a witness; that he answered all questions to the best of his knowledge.

Mr. Mickey Bozarth testified that he was an employee of the bank and that he knew when examined on voir dire that Mr. Northington was to be a witness; that he then also knew that decedent had been a customer of the bank. As to his personal relations with her, we quote his testimony:

"Q. I will ask you whether or not you had personal contact with Mrs. Williamson on or about September 7, 1962?

A. I don't think I did.

Q. To refresh your memory, that is the date that they broke into the bank deposit box?

A. I don't remember how it was broken, but I don't think that I broke it. The only thing that I can remember about it is the charge we made on it, but don't remember about the breaking.

---

1. The death of appellant pending this appeal has been suggested. The appeal is not abated and there is no need to substitute parties for appellant. Rule 369–a, Texas Rules of Civil Procedure.

Q. It came to light that you made the charge?

A. That is right.

\* \* \* \* \* \*

Q. Mrs. Williamson did most of her business at the First National Bank?

A. Yes.

Q. And you had contact with her from time to time?

A. Not very much. I really did not know Mrs. Williamson very well.

Q. Well, who has charge of the safety deposit boxes?

A. Mr. R. A. Wright.

Q. But when the charge went through you signed your name?

A. I believe my name is stamped on there with a rubber pad, but I don't really remember having done it. I probably did, though.

Q. This is the charge slip that came through. Is this your signature?

A. That is my signature,—no, that is a rubber stamp.

Q. Did anyone else have any authority to use that stamp?

A. I don't think that anyone used it but me but it was there available."

Mr. Bozarth also testified:

"Q. Now, on your examination on voir dire did you acquaint either of the attorneys as to such information?

A. You asked specific questions and so did Mr. Johnson, and I answered two or three of them but don't remember exactly what they were.

Q. Do you remember that I asked the specific question if you had any knowledge or information of any kind that might influence in your verdict?

A. Yes, but I did not feel that this would in any way influence me and as I did not know anything about it."

Mr. Bozarth also testified that he remembered a list of witnesses being read at the time of his examination.

The attorney for appellant, the Hon. J. J. Byrne, testified, and we quote from his testimony:

"\* \* \* I examined the jurors in said proceeding touching their service and qualification as jurors. I had no knowledge whatsoever that C. A. Northington was a witness in behalf of the proponent. I had no knowledge whatsoever that Mickey Bozart had had business dealings with Mrs. Edith Williamson. If I had known that Mrs. Edith Williamson had had personal contact and business dealings with Mickey Bozart I would have exercised my prerogative to have challenged the serving of Mickey Bozart as well as Eddie Patrick. The attorney for the proponent did not use C. A. Northington in the trial of the case in the county court. Some of the witnesses that he used in this case appeared without summons. It is true that C. A. Northington was under subpoena but this attorney had no knowledge or information from any source that C. A. Northington was going to be a witness in behalf of the proponent in the probate of this will. If this attorney, the contestant's attorney, had had any knowledge or information that Mickey Bozart had had dealings with Mrs. Edith Williamson, or that C. A. Northington was going to be a witness in behalf of the proponent, C. A. Northington being the employer of Bozart and Patrick, both names would have been challenged.

\* \* \* \* \* \*

Q. Mr. Byrne, when did this matter first come to your attention, this short slip? September 2, 1962? The charge to Mrs. Williamson for drilling the deposit, safety deposit box, on which the signature of Mickey Bozart appears. When did that first occur?

A. In the trial of the case you will remember I jumped up and called to the attention of the court and we both came to his desk, and called the matter to his attention, and it was a shock to me."

The Hon. R. L. Johnson, attorney for appellee, also testified. He stated that he only called the names of the witnesses who were in the courtroom in order that they might be sworn. He did not call the name of Mr. Northington because he was not then present.

Mr. C. A. Northington testified that Mr. Byrne knew he was president of the First National Bank, and this is to be inferred from the testimony of Mr. Byrne.

The appellee introduced on the hearing a subpoena for Mr. Northington as a witness showing service on him on July 20, 1964. The trial was held on the 27th and 28th of July, 1964.

He also introduced a charge slip showing that the First National Bank had charged decedent's account with $10.00 for drilling and replacing a lock on a safety deposit box, which charge slip was signed by Mr. M. F. Bozarth.

Mr. Northington testified for appellee. He had known the decedent and her son, appellant, all of his life. All were close friends. The decedent was a customer of the bank of which Mr. Northington was president. In the opinion of Mr. Northington decedent was capable of attending to her affairs and had sufficient mental capacity to make a will. Twelve other witnesses testified that, in their opinion, decedent was of a sound mind.

The record does not disclose that appellant moved for a mistrial upon learning that Mr. Northington was a witness and that the juror Bozarth may have had some business transactions with the decedent.

■ In El Paso Electric Co. v. Whitenack, 1 S.W.2d 594, the Commission of Appeals quoted, with approval, the following from Rice v. Dewberry, 93 S.W. 715, 721; 95 S.W. 1090, Galvaston C.C.A.:

" 'It seems to be settled that an objection that a juror who sat in the trial of a cause was not a qualified juror comes too late when not made until after the verdict has been returned. The rule is not made dependent upon the question of negligence on the part of the complaining party in not sooner discovering the fact of disqualification, but seems to be absolute, and doubtless rests upon reasons of public policy which require that objections going to the qualification of jurors shall be made before the return of the verdict in order to prevent the possibility of a party to a suit, after he has discovered that a juror is disqualified, taking chances on a verdict in his favor and in such case concealing the fact of the disqualification of the juror, and, if the verdict is otherwise, taking advantage of such irregularity for the purpose of obtaining a new trial.' "

■ This rule, applied here, is dispositive of the points under consideration and requires that they be overruled. We desire to add these observations. Jurors Bozarth and Patrick did not falsely answer any questions asked them on their voir dire. Neither did they conceal any facts on such examination. Nor is it shown that they were biased or prejudiced jurors, or that they were in any sense disqualified to sit as jurors in this case. If appellant desired to know more about these jurors, it was incumbent upon him to propound specific inquiries. Coulson v. Clark, Tex.Civ.App., 319 S.W.2d 183, Austin C.C.A., writ ref. n. r. e., opinion

by Chief Justice Archer. This he failed to do.

■ Appellant's remaining Point is the verdict of the jury "is against the weight of the credible evidence given in this cause and is contrary to all the medical evidence in this cause."

We construe this assignment as applying only to the jury finding that decedent possessed testamentary capacity when she executed the instrument offered as her will.

We have adverted to the number of witnesses who testified that, in their opinion, decedent was of sound mind. Most of these witnesses were long acquaintances of decedent and to set out their testimony would be repetitious and of little value. We will review the testimony of Judge J. C. Abney, an attorney who drew the proffered will. He had known decedent for 70 years. She came to his office in July 1962 and gave him instructions for drawing her will. No one else was in the office at the time. In September 1962 she came back to the office and executed the will. Judge Abney, when asked if, in his opinion, Mrs. Williamson was of sound mind at the time, replied: "Yes, or I would not have permitted her to sign it."

Mrs. Williamson had told Judge Abney in July when she talked to him about her will that she suspected a relative of taking things from her bank box. Judge Abney, doubting the validity of this accusation, conferred with her banker and doctor in order to satisfy himself that she was capable of making a will.

Appellant offered Troy Poll as a witness who, on cross examination only testified regarding the mental condition of Mrs. Williamson, "I think she was all right; like older people."

Appellant also offered Fred Peeler as a witness who testified that in the summer of 1962 Mrs. Williamson was of sound mind.

Mrs. Parc Williamson, testifying for appellant, stated she visited Mrs. Williamson in the rest home in Lampasas and that "her general condition" was "poor." This was in the early part of 1963. Mrs. Williamson suffered a stroke in May 1963.

Mrs. Will James, testifying for appellant, stated that in August and September of 1962 the physical condition of Mrs. Williamson was "poor." As to her mental condition she answered, "Well, we had noticed that Mrs. Edith's mind seemed to be leaving her in a way because she did not remember anything and she would just sit and look at you." This condition worsened after Mrs. Williamson had a stroke in May 1963, according to Mrs. James, and at this time she could not speak.

Mrs. Soules, a witness for appellant, testified that in December 1960 and January 1961 the physical and mental condition of Mrs. Williamson was "fair."

Mr. Charles W. Lynch, County Attorney of Lampasas County, testified for appellant and stated that in July 1962 decedent came to his office for the purpose of filing a theft complaint against appellant and that he refused to file it. Regarding her mental condition he testified, "I hesitate to go so far as to say that she was of unsound mind. I say that she did not in my opinion have control of her own mind at that time."

Dr. W. M. Brook testified for appellant and gave a medical history of her covering a period of years. He stated that during such time she had undergone "some more or less general mental and personality changes." In July 1962, Dr. Brook noted on her record that her "Senile symptoms" were "mild," and that she was "disorientated" on "occasion."

Dr. Brook testified to small incidents which demonstrated a change in the personality of Mrs. Williamson and stated, "There were some professional things she would call me and ask me about and then not take my advice, which might not have been proper or good, but these various little things we see in so many people as senility begins to become more pronounced, she had, I think,

**176**

a little more than ordinarily, personality change, because of her arterioschlerosis."

Dr. Brook did not give an outright opinion that Mrs. Williamson was of unsound mind.

Considering all of the evidence, it is our opinion that the verdict of the jury finding Mrs. Williamson to have had mental capacity to execute a will is not so against the overwhelming weight and preponderance of the evidence as to be manifestly wrong or unjust.

The judgment of the trial court is affirmed.

Affirmed.